[No. 2158.]

### E. S. STOUT *v.* THE STATE.

1. PRACTICE.—It is the peculiar province of the jury to reconcile conflicts and inconsistencies in the evidence adduced before them, and their find-ing will not be disturbed by this court, if the evidence, though improbable, is sufficient to support the verdict.

2. ASSAULT TO RAPE—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for assault to rape a married woman in bed with her husband.

APPEAL from the District Court of Red River. Tried below before the Hon. D. H. Scott.

The conviction in this case was for an assault with intent to rape one Emma Gatz, in Red River county, Texas, on the twenty-ninth day of July, 1885. A term of two years in the penitentiary was the punishment assessed against the appellant.

Emma Gatz, the first witness for the State, testified that she was the wife of Gus Gatz, and on the last day of July, 1885, lived with her husband, at his restaurant, in the old Shanahan house, just north of the county jail, in the town of Clarksville, Red River county. She knew the defendant, E. S. Stout. The witness retired before her husband did on the night of the last

day of July, 1885. She left her husband in the front of the house, talking with a boarder named Joseph. Within ten or fifteen minutes her husband came to bed. Their bed room was the middle room at the east end of the house, to which there was no outside door. The two inside doors were closed and locked. The one window on the east end of the room was of good size—say three feet wide by three and a half feet high. It was about three and a half or four feet distant from the side walk running north and south with the house. The lower sash of that window was left up, and a colored curtain was drawn down before the opening. Witness went to sleep across the bed, next to the head board, her feet pointing east. Her husband went to sleep across the foot of the bed, with his feet to the west. Some time after both the witness and her husband had fallen asleep, the witness felt the hands of some person pressing on her chest. Thinking the party was her husband, the witness said: "Let me alone, Gatz; I am sick." Witness went to sleep again, but was awakened after a while by some one raising her gown. Witness attempted to raise up, but was pressed back by some body's hands on her chest. She then attempted to raise up a second time, but was pressed back in the same manner. Witness then looked and saw that the party pressing her and raising her gown was E. S. Stout, the defendant. She then called to and kicked her husband, who was hard to waken, and the defendant sprang out through the window. The entry into the house and the assault upon the witness's person were both made without the consent of the witness.

Cross examined, the witness said that it was after supper when she went to bed, but she could not tell whether it was then ten, twelve or two o'clock. She was not asleep when her husband came to bed. The window described by witness—the only one in the room—was on the east side, looking towards the court house, and opened on the street. The witness did not know what time it was when defendant came into her room. When defendant first began feeling of witness's bosom she said: "Quit, Gatz." The feeling continued, and when she awoke again, an effort was being made to get her gown up. The defendant, whom the witness then fully recognized, was standing on the floor by the bed. He did not get into the bed. All that defendant did was to put his hand on witness's chest below her throat, and push her back when she attempted to rise up. It was while she was being pushed back the second time that the witness rec-

ognized the defendant. He did not get either his body or face on the witness. The moon was shining brightly, but witness did not know how high in the heavens it then was, or at what hour it rose. About half of the curtain before the window was of a dark shade, and the other half of a lighter color, it being of a mixed, flowered fabric. The moon shone in at the window and lighted up the room. . Gatz saw the negro (the defendant) as he jumped out of the window. Defendant had on a brown hat, coat and pants. Witness did not know what kind of shoes he was wearing. He had twice before been at the house to get something to eat. He had never worked for the witness, and she had but a slight acquaintance with him. There had been some trouble between witness's husband and the defendant about witness's cook, one Fanny Lane. Gatz found defendant in Fanny's room one night, and ran him away. The witness had lived in Clarksville only since February, 1885. She testified as a witness against the defendant on his examining trial before Justice Stanley a few days after the assault. Witness stated on that trial that the defendant came into her room, and pushed her back on her bed. She could remember nothing else to which she testified before Justice Stanley.

The witness's attention was called to her testimony on the examining trial, and she was asked if she did not, on that trial, testify, among other things, that the defendant "choked her by catching her by the throat until she could not scream any more?" She replied that she called pushing her back, with his hands on her chest, choking. She was then asked if she did not testify on the examining trial that the assault upon her was made between one and two o'clock?" She replied that she did not know what she said about that matter. She did know, however, that she had been asleep a long time when she was awakened by the defendant. The defendant's attorney, reading from the record of the examining court, asked the witness if she did not, on the examining trial, testify as follows: " When he had his hand on my breast he had his face against mine, and he did lay right on top of me. Don't know when he got on top of me. He was on top of me when I awoke the second time. The same time that he pushed me back he was on top of me." She replied that the defendant did not get into the bed, but that she called standing on the floor and "kinder" leaning over being on top of her and putting his face to hers. She added: "The defendant got down close to me and you can call it what you want to." Con-

tinuing, the witness stated that all of the doors in the house were closed. Defendant went out at the window like lightning when she called to her husband. The witness did not know that she could distinguish the defendant's features. Her husband ran to the window after the defendant got out and said that he could see defendant near the garden fence. Witness was asked if she knew Emma Allen and Sallie Dyer. She replied that she did not, but she knew two negro girls called Emma and Sallie. She was then asked if she did not call Sallie Dyer into her house one day and ask her to tell Emma Allen to come and see her, and that she, witness, wanted to get Emma to swear against the defendant? Witness replied in the negative. She was then asked if Emma Allen did not owe her for a pair of shoes and she replied in the affirmative. She was then asked if Sallie Dyer did not go off and get Emma Allen and bring her to her (witness's) house, and if witness did not, in the presence of Sallie Dyer, tell Emma Allen that if she would go into court and swear that the defendant admitted to her that he went into witness's room she would give the said Emma the amount due on the shoes, as well as some other things? The witness replied that she made no offer whatever to Emma to swear against the defendant, but, having heard that Emma had certain knowledge about the assault she sent for Emma and told her that if she had in fact personal knowledge of it, as she, witness, had been informed, and she would testify to the same on the stand, she would relinquish to the said Emma the debt on the shoes. Emma said that she knew nothing about the matter. The bed stood rather cross ways with the room and in front of the window.

Gus Gatz was the next witness for the State. He testified that he knew something about the assault upon his wife on the night of the last day of July, 1885. Witness, his wife and Mr. Joseph, a boarder, sat out in front of the witness's restaurant on that night until some time between nine and ten o'clock. Mrs. Gatz retired a short time before the witness did. Soon after Mrs. Gatz retired, witness remarked that it was bed time. Joseph left and witness closed the house and followed his wife to bed. The window was up but a red and white colored curtain was drawn down before it. Some time after witness went to sleep he was awakened by his wife hallooing and kicking. Witness sprang up and saw the defendant disappear through the window. At the moment that the witness saw him, the defendant had but

one foot inside of the window, his other and his face being on the outside. He was then in the act of jumping. Witness ran to the window and saw him at a distance of five or six feet from the window, going up the side walk towards the court house. Defendant looked back at witness and grinned. The witness did not know how high the moon was, but it was shining very brightly. Witness's house sat east and west, and the window through which the defendant left the house was at the east end. The moonlight streamed in at that window. The court house, towards which the defendant went after escaping from the room was north of the house. Witness's wife was lying on the front side of the bed. Witness lay on the back side, at the foot of the bed, with his head against the wall. On one occasion, at night, some time before this assault upon his wife, the witness was informed by a boy that somebody was in the room of his cook, a colored woman named Fanny Lane. The witness went to that room and found the defendant in bed with his said cook. Witness would call the defendant a dark brown or almost black negro. The assault upon Mrs. Gatz was committed between one and two o'clock in the night.

Cross examined, the witness stated that he had lived in Clarksville three years. He was married to his wife, the injured party, during the year 1885, and had known the defendant since the summer of that year. Both the witness and his wife retired on the night of the offense after nine and before ten o'clock, his wife preceding him to bed a few minutes. The room occupied by them had two doors and one window. Both of the doors were closed and locked, and the lower sash of the window was up, with a colored calico curtain down before it. That window opened east and the sash was a large one. The witness saw no one enter the room, but saw the defendant leave the room through the window. He then had but one foot in the house and his back was towards the witness, but witness recognized his figure. Defendant was five or six feet from the window when witness reached it. He turned his face towards witness and grinned. His escape through the window was a rapid one, and made in a stooping posture. Witness could not remember whether or not he testified before the examining court to the fact that the defendant turned and grinned at him after he reached the window. The defendant wore a brown hat, brown coat and pants. The coat was a short sack coat, and his clothes all fitted him closely. Witness heard him walking off, and knew from

the noise made on the pavement that the defendant had on shoes. The witness never had a dispute with defendant about ice cream. He did get angry when he found the defendant in bed with his cook. Witness had no recollection of telling Willie Jenkins or Pete Hines anything about the matter, or making any threats against the defendant, although he may have told the parties named and uttered threats. Witness discharged his cook, Fanny Lane, shortly after discovering defendant in bed with her, which was some time before the assault upon Mrs. Gatz. The State rested.

Willie Jenkins, colored, was the first witness for the defense. He testified that during the summer of 1885, he boarded with Pete Hines, who lived in the first house west of the house occupied by Mr. Gatz, and but a few steps distant. Witness, in going to and from his boarding place, always passed Gatz's house. Gatz, who was a tailor as well as a restaurateur, made witness's clothes, and apparently thought a great deal of witness. He would frequently call witness into his house and hold long conversations with him. It was the witness who told Gatz about the defendant being in the room of Fanny Lane, his cook. Two or three weeks before defendant's arrest for assaulting Mrs. Gatz, Gatz told witness that he would either have the defendant arrested or kill him. This was after Fanny Lane had left Gatz's.

Fanny slept in the back part of the house, some distance from the room occupied by Gatz and his wife. Gatz's house was a large one.

Peter Hines, colored, testified, for the defense, that Mr. Gatz met him on the streets of Clarksville two or three days before the arrest of defendant for the assault upon Mrs. Gatz, and said to witness, as near as witness could remember, that he was going to have defendant arrested for going into his house for the purpose of "carrying on" with Fanny Lane.

Doctor R. G. Lane testified, that he was familiar with the sleeping room of Gatz and his wife, having visited it as a physician. It was the middle room at the east end of the house. It had two doors and a window. With both of those doors shut and a curtain hanging before the window, it would be impossible to recognize one person from another at night.

Sallie Dyer, colored, testified, for the defense, that her acquaintance with Mrs. Gatz began some time before the arrest of the defendant. Some time after that arrest witness was passing Mrs. Gatz's house, when that lady called her in and asked if

witness knew where Emma Allen could be found. Witness replied that she did. Mrs. Gatz then said that if witness would find Emma and bring her to the Gatz house she would give witness a certain blue dress. Witness found Emma and took her to Mrs. Gatz. Mrs. Gatz told Emma, in the presence of the witness, that if she would attend the trial of the defendant, and testify on that trial that the defendant admitted to her, Emma, that he went into Mrs. Gatz's room on the last night of July, 1885, she would release Emma from the balance of fifty cents due her on a pair of shoes. Emma declined the offer, remarking that she would not swear to a lie for fifty cents, and, moreover, was going to pay Mrs. Gatz the fifty cents.

Cross examined, the witness said that she did not understand Mrs. Gatz's proposition to contemplate the swearing to a lie by Emma, but a proposition to induce Emma to tell on the stand what she, Mrs. Gatz, claimed to have heard as facts within Emma's knowledge.

Emma Allen testified, for the defense, that a few days after the arrest of the defendant, at which time witness did not know defendant, Sallie Dyer told her that Mrs. Gatz wanted to see her. Witness and Sallie went to Mrs. Gatz's house, when Mrs. Gatz proposed to release the witness of a debt of fifty cents due on a pair of shoes if witness would swear against defendant. The witness told Mrs. Gatz that she knew nothing about the charge against the defendant, and would not swear to a lie for any one. Mrs. Gatz insisted that witness should swear that defendant told her that he went into Mrs. Gatz's room as charged, and "stood" witness "down" that it was her duty to do so. The witness had not yet paid the fifty cents.

On cross examination, the witness said that Mrs. Gatz claimed to have heard that witness could swear that defendant confessed to her that he committed the assault, and she appeared to believe it as a fact. She did not propose that witness should give such evidence on the trial whether true or false.

H. L. Norris testified, for the defense, that he was the proprietor of a saloon in Clarksville, situated on the next block east of and about seventy-five yards from Gatz's house. It fronted on the next street east, and ran parallel with the street on which the east end of Gatz's house fronted. The defendant and Peter Hines came into the witness's saloon at eleven o'clock on the night of the alleged outrage, took a drink together and left, going up the street towards the Donaho hotel. The witness knew

the hour at which they entered the saloon from the fact that one or the other asked the time.

Peter Hines testified, for the defense, that defendant came to his house about ten o'clock on the night of the alleged assault, remained until about eleven, and thence went with witness to Norris's saloon, where they took a drink. Leaving the saloon they went north until they got to the next street running east, which the witness took to go to a church festival, and the defendant kept on north towards Mrs. Hinson's, at which place Fanny Lane then lived. On his cross examination the witness said that the defendant could have turned back after he and witness separated, and gone to Gatz's.

R. F. Hinson testified, for the defense, that he was kept at his store until a quarter past eleven o'clock on the night of the alleged assault upon Mrs. Gatz. When he reached home he went out to his cistern, and, while there, heard the defendant and Fanny Lane, then witness's cook, talking in Fanny's room, in which there was no light. Witness did not see defendant, but knew his voice. Witness went to bed, and heard nothing more of defendant on that night.

Fanny Lane testified, for the defense, that she lived at Mr. Hinson's at the time of and before the arrest of the defendant upon the charge of assaulting Mrs. Gatz. At about eleven o'clock on the night of the alleged assault defendant came to witness's room at Mr. Hinson's and asked witness if he could stay there that night, and the witness told him that he could. Before retiring, the witness locked the door and placed the key under the head of her bed. Besides that door there was but one opening to the room, a window against which the head of the bed was standing. Defendant staid all night with the witness, sleeping in the same bed with her. He did not leave until after breakfast next morning.

Cross examined, the witness said that neither she nor the defendant were married. Witness was not afraid to sleep with the defendant. The defendant could not have secured the key from under the witness's head and left during the night without awakening her. The witness always locked her room and placed the key under the head of her bed. Witness slept most of the night, but was awake a time or two.

For the purpose of contradicting the witness Emma Gatz, the defense read in evidence her testimony before the examining court, as follows:

"My name is Emma Gatz. I know the defendant, E. S. Stout. I know Gus Gatz, pointing both parties out in open court. He came in the house. Don't know how he got in. It was Gus Gatz's house. He came in between one and two o'clock in the night, the last day of July, 1885, in the State of Texas, county of Red River. I saw him in the house close to the bed. He opened my night clothes, and when I screamed, to awake my husband, he caught me by the throat and choked me until I could scream no more. My husband, Mr. Gatz, was in the same bed with me. I called Mr. Gatz several times, trying to get him to awake. The window was open where defendant got out, and it was open before I went to bed. The bed was five or six feet from the window. It was a moonshine night. The window faced the new court house. The outside doors were all shut. The middle door only was open, and no one could enter that way. I did leave the window open when I went to bed. Don't know how long defendant was in the room. He had his hand in my bosom when I first saw him in the room. He put his hand in my bosom and I thought it was my husband, and I told him to let me alone, and I laid myself on my back, and then defendant caught me by the throat and put his face close to mine, and, when my husband awoke, the defendant let loose and jumped out of the window. Defendant did not say a word. I am married. Gus Gatz is my husband. He is the one that was in the bed with me at the time. Mr. Gatz was sleeping with his head to the foot of the bed, and I was lying across the bed. I have known the defendant nearly as long as I have lived in Clarksville. He came into my house at two different times to get some lunch."

Cross examined: "It was last Friday night, between one and two o'clock. The moon was shining. The moon was so high that I could see Stout. Don't know how high it was. Don't know how long the moon had been up. Don't know if it was a full moon or not. Don't know whether the window faced north or not, but it faced towards the new court house. The moon was shining in at the window. The defendant did jump out at the window. It is a good sized window. Don't know the size exactly. The window was left open when I went to bed. It had curtains which were down, but not fastened, so that nobody could look through the room. By jumping through the window, one half of the curtain was pulled through the window. It hung on the window, one half inside of the room and one half

outside. The outside doors were all closed. The inside door, connecting the room with the tailor shop, was open. There was only one window to the room. The door that would admit any light was shut. I slept a long time, and that made me think it was so late. It was a good sized, big bed. Mr. Gatz was lying on the side of the bed, with his face to the wall. His head was to the foot of the bed. I rolled off of my pillow and was lying across the bed. I can't tell how far apart my husband and myself were lying. My head was against my husband's feet. My husband and myself went to bed at the same time, at about ten o'clock. I did not notice if the moon was up. The first that I noticed that night was that somebody had their hand in my bosom. I thought it was Gatz. I was lying on my back. At first I did not move at all, and I told my husband to leave me alone, and when the feeling kept on I raised my head and screamed until my husband woke up, and the defendant jumped out of the window. When I raised my head I saw it was not my husband, because I saw him sound asleep. When I saw the defendant put his hand on my throat I screamed. I did not know who it was until I raised my head. I don't know how many times I screamed, but it was several times. When I called loud for my husband, the defendant jumped out of the window. When he had his hand on my throat he had his face on mine. He did lay right on top of me. When I awoke the second time —the same time that he pushed me back—he was on top of me. My night dress was pushed up and opened at the breast. His hand was on my chest, not on my throat. Defendant jumped out of the window as soon as I woke up. He went out like lightning. I did not have time to look at him. I did not shake or pull my husband to wake him up. I saw it was defendant when I raised my head. It was just as bright as day light in the room, and I could distinguish one negro's face from another's. I told my husband it was Stout, when I first woke up. My husband saw the defendant as he passed the fence, and recognized him. I saw the defendant twice in my house. The man I saw in my house on this night had on a coat. Don't know if he had on a hat or not. Don't know if he had on shoes or not. Did not know the color of the coat, but think it was brown; When I first saw him, he was standing up by the front of me. He did not get in bed with me, but he laid on me and had his feet on the floor. I can swear by everything that is holy that it was the defendant at my bed. He was standing on the floor

and had his weight on my chest, and did not get in the bed. I roll considerably in my sleep. I am certain that the man in my room was a negro."

The defense introduced in evidence an almanac for 1885, showing that on the night of the alleged assault the moon rose at twenty-nine minutes past eight o'clock p. m. The defense closed.

H. L. Norris, recalled by the State, testified that in going from Gatz's to Henson's the distance would be the same over the street running north and south past the east end of Gatz's house as by going one street further east before turning north. The distance between the houses of Gatz and Henson was not over three hundred or four hundred yards.

The motion for new trial raised the questions discussed in the opinion.

*Sims & Wright* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Whilst it would ordinarily appear exceedingly improbable and highly incredible that a party should attempt to ravish a married woman in bed with her husband, still it is by no means impossible, and circumstances may well be imagined in which the assailant would take the risk of such an attempt in the hope that it could be accomplished without discovery in his victim's mistaken belief that it was the act of the husband. It will not do to say that a thing is impossible because it appears unreasonable or improbable. To so argue is "purely a speculative attempt to sound the depths of human depravity and to assign arbitrary limits beyond which desire and passion are to be held incapable of seducing or impelling human nature."

In this case there are some apparent inconsistencies shown in the statements made at different times by the principal witnesses for the prosecution, but they do not occur as to the main facts that the assault was made and that defendant was the guilty party. There is also some conflict in the evidence. This was matter exclusively for the jury to determine. They have seen fit to credit the testimony of the prosecuting witnesses and we can not see that that testimony is either improbable or untrue.

The jury and the court below were in much better attitude to judge of the credit and weight to be given it than are we. That it is sufficient to support the judgment if entitled to credit we have no doubt. Having found no error in the conviction the judgment is affirmed.

*Affirmed.*

Opinion delivered November 17, 1886.